CHARLES STORES CO. Inc., v. O'QUINN.

No. 5981.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 15, 1949.

Decided Dec. 12, 1949.

---

McNeill Smith and C. R. Wharton, Greensboro, N. C. (A. W. Sapp and Smith, Wharton, Sapp & Moore, Greensboro, N. C., on brief), for appellant.

Welch Jordan and Norman A. Boren, Greensboro, N. C. (Hines & Boren, Greensboro, N. C., on brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

This case grew out of the arrest and prosecution of L. R. O'Quinn, the plaintiff in the District Court, for the larceny of a woman's blouse worth $3 from the store of Charles Stores Company, Inc., in Greensboro, North Carolina. Three days after the arrest during which the accused was on bail in the sum of $100, the criminal case was tried. At the trial he proved an excellent character and was acquitted. He brought the pending suit for malicious prosecution and was given a verdict by the jury of $15,000 of which $9,000 was awarded for actual damages and $6,000 for punitive damages. Motions by the defendant during the trial for a directed verdict in its favor and a motion for judgment n. o. v. for the defendant were denied by the District Judge. These motions were based on the ground that there was no substantial evidence to show that George C. Carp, the manager of the store who was blamed by the plaintiff for the arrest, had either express or implied authority from his employer to instigate a criminal prosecution; and upon the further ground that the prosecution was in fact not instituted by Carp but by the city police. In our opinion, in view of the evidence now to be set out in the manner most favorable to the plaintiff these motions should have been granted under the law of North Carolina.

O'Quinn was a war veteran and as such was a student of accountancy at a business college in Greensboro. He was married and lived with his wife and child some distance from the city and drove back and forth to the school daily in his automobile, accompanied by Nelson James, a neighbor, in the morning and at lunchtime, but not in the evening since James' business day lasted longer than the sessions of the school. On September 14, 1948, at the close of the school, O'Quinn went to the lot, two blocks from the Charles Store where he parked his car, and found a lady's blouse lying "loose and not wrapped up" on the front seat. He assumed that it belonged to James and left it in the car when he parked on the side of the road near his house so that James might pick it up when he came from work. Learning that night that James knew nothing about the matter, O'Quinn gave the blouse to his wife. They concluded that the store had put the blouse in the car as an advertising scheme to draw trade. However neither the color nor the size suited Mrs. O'Quinn, and since a ticket attached to the garment indicated that exchange must be made in five days and since Mrs. O'Quinn worked at night and slept in the daytime, she persuaded Mrs. Campbell, a neighbor, to take it to the store the next morning and exchange it. When Mrs. Campbell presented the blouse at the store the saleswoman in charge of the blouse department, who had missed the blouse from the counter a day or two previously, noticed that there was a complete price ticket on the garment and that there was no sales ticket. It was the custom of the store when the sale of an article was made to tear the sales ticket in two parts and keep one part as a record of the sale. Accordingly, the saleswoman called the manager who took the blouse from Mrs. Campbell, gave her a receipt for it, and told her that Mrs. O'Quinn must come in person to make the exchange.

Immediately thereafter the manager notified the police and was instructed to hold

the blouse and to call the police when the claimant came to the store. On September 17, the following Saturday morning, Mr. and Mrs. O'Quinn came to the store and presented the receipt to the manager who told them that the store had been bothered a lot by shoplifters and that the blouse appeared to be stolen since a complete price tag was still on it. They explained how the blouse came into their possession and said that if it was stolen they wanted nothing to do with it. Carp accepted their explanation and told them that they had been so nice and cooperative that he would give them a blouse any way. He added that the police were making an investigation which would probably be completed in a week and he told the O'Quinns to keep the receipt and come back the following Saturday to get a blouse. When they left the store he again called the police and agreed to communicate with them when the O'Quinns returned.

They did not return until Saturday, October 15, nearly a month later. O'Quinn remained outside in his car to avoid parking, while his wife entered and asked Carp about the blouse. He instructed her to go to the police headquarters and see a city detective who would give her the blouse. At that time the blouse was in fact in Carp's custody in the store. The O'Quinns went to the City Hall and while he drove around she went in and was questioned by the detectives. She told them fully her connection with the matter as well as her conversations with Carp and asserted her innocence. They told her they were going to arrest her and proceeded to the warrant desk when they met O'Quinn coming in after his wife. He told the officers that he was the responsible party as he had found the blouse in his car, and thereupon they released her and arrested him. They preferred the charge of larceny, detained him about thirty minutes until he was able to furnish bail for appearance on the following Tuesday, when he was tried and acquitted.

While the O'Quinns were at the station, the police communicated with Carp, ascertained that he still had the blouse in his possession, and told him they were going to prosecute O'Quinn. Carp, according to his testimony, told them that he did not believe they had a case against the O'Quinns. The officers, however, denied that he made this statement.

■■ We do not think that it can properly be inferred from these facts that the store manager caused the arrest and prosecution of O'Quinn. The manager's connection with the transaction consisted in reporting the circumstances to the police and acting under their instructions. It is not disputed that goods had been recently stolen from the store; and when the O'Quinns brought in a blouse that appeared to have been stolen from the store, and related the remarkable way in which it had come into their possession, the manager's report of the case to the police was neither unlawful nor improper. Nor was it improper to give the police an opportunity to interview the O'Quinns when they returned the second time to the store. It is contended that the manager participated in the arrest because he led the O'Quinns to believe at the first interview that their story was accepted as true, and induced Mrs. O'Quinn at the second interview to go to the police under the false impression that they would give her the blouse; and it is also pointed out that, according to the police, the manager falsely testified that he told the police on the day of the arrest that he did not think the evidence justified a prosecution. Granting that the evidence as to these incidents must be taken most strongly in favor of O'Quinn on this appeal, it does not follow that the manager caused the arrest. That was done by the police upon their own authority after they were fully informed by questioning both the man and his wife and had reached the conclusion that a crime had been committed. It cannot be said that one who reports suspicious circumstances to the authorities thereby makes himself responsible for their subsequent action, and this is true even when, as in this case, the suspected persons are able to establish their innocence.

■ Even if it be assumed that Carp instigated the prosecution, it does not follow

that his employer is responsible for his acts unless it is shown that he was acting with its authority. This is the decisive point in the case; and the evidence conclusively shows that Carp had no authority from his employer, either express or implied, under the law of the state to institute the criminal prosecution. The absence of express authority is beyond dispute since his written contract of employment contained the following provision: " * * * The Manager shall likewise have no authority whatever, expressly or by implication, on behalf of the Company, to arrest or cause to be arrested any person whomsoever or to institute a civil or penal action or criminal prosecution of any kind, for any cause or reason whatsoever, whether in protection of the Company's rights, property or otherwise, or to suggest, aid, abet, commence, or assist in any such arrest, action or prosecution without the prior written instructions of either the President, Vice-President, Secretary or Treasurer of the Company."

■■ The absence of implied authority under the circumstances of the case is equally clear. It is frequently said that the action of malicious prosecution is not favored in law since public policy favors the exposure of crime which a recovery against a prosecutor tends to discourage. National Surety Co. v. Page, 4 Cir., 58 F.2d 145; Id., 4 Cir., 59 F.2d 370; 34 Am. Jur., Malicious Prosecution, Sec. 5. An examination of the long list of decisions of the Supreme Court of North Carolina on the subject demonstrates that the law of that state conforms to this policy, with the result that it is now settled that the authority of an agent to institute a criminal prosecution may not be implied from the agent's purpose to prosecute criminally one whom he believes to have wronged his employer, unless it also appears that the prosecution will serve to preserve and protect the property of his employer in his custody from the offender. The leading case cited many times in subsequent decisions is Daniel v. Atlantic Coast Line Railroad Co., 1904, 136 N.C. 517, 48 S.E. 816, 67 L.R.A. 455, 1 Ann.Cas. 718, in which the agents of the Railroad Company

caused the arrest of a passenger for the larceny of money from the company's depot at Greenville. The passenger had been waiting in the depot for a train and the money was missed after he had left. He was arrested at the instance of the agents of the railroad several hours later in another town after he had retired for the night in a hotel. The case was subsequently dismissed for insufficient evidence. The Supreme Court characterized the conduct of the agents as inexcusable and humiliating in the extreme, if not criminal, making them responsible to the plaintiff in damages, but exonerated the Railroad Company from liability since it had not authorized or approved the agent's acts. The court said, 136 N.C. at pages 522, 523, 48 S.E. at page 818:

"A servant entrusted with his master's goods may do what is necessary to preserve and protect them, because his authority to do so is clearly implied by the nature of the service; but when the property has been taken from his custody or stolen, and the crime has already been committed, it cannot be said that a criminal prosecution is necessary for its preservation or protection. This may lead to the punishment of the thief or the trespasser, but it certainly will not restore the property, or tend in any degree to preserve or protect it. It is an act clearly without the scope of the agency, and cannot possibly be brought within the limits of the implied authority of the agent. It would seem that so plain a proposition should need neither argument nor authority to support it, but we are abundantly supplied with both in the cases upon the subject. * * *

"'There is a marked distinction between an act done for the purpose of protecting the property by preventing a felony or of recovering it back, and an act done for the purpose of punishing the offender for that which has already been done. There is no implied authority in a person having the custody of property to take such steps as he thinks fit to punish a person who he supposes has done something with reference to the property which he has not done. The act of punishing the offender is not

anything done with reference to the property. It is done merely for the purpose of vindicating justice.' "

In 1948 this case was cited with approval in Pridgen v. Carolina Coach Co., 229 N.C. 46, page 51, 47 S.E.2d 609, at page 613, where the court said: "Ordinarily, the criminal prosecution of an offender is not within the scope of an agent's authority, unless such criminal prosecution was instituted to protect the property of his employer or to recover property belonging to him. And when the act of the agent could have no effect other than the punishment of the offender, such act will not be construed as an effort to punish the offender because he had wronged his employer, but because he had wronged the State. Dickerson v. Atlantic Refining Co., 201 N.C. 90, 159 S.E. 446, and cases cited therein. 'There is a marked distinction between a false imprisonment or arrest caused by an agent for the purpose of protecting the rights or interests of his master—that is, to protect property to prevent its theft, or to recover it back—and an arrest or imprisonment caused for the purpose of punishing an offender for an act already done.' " 22 Amer.Jur. (False Imprisonment), Sec. 38, p. 380.

The strictness with which this rule is applied is shown by the decision in Hammond v. Eckerd's of Asheville, 220 N.C. 596, 18 S.E.2d 151, where, by the decision of a divided court, the owner of a drug store was freed from responsibility for the arrest and search of a customer on the sidewalk outside the store at the instance of the clerk in charge of the cigar counter who mistakenly believed that the customer had stolen cigars while in the store. See also Lamm v. Charles Stores Co., 201 N.C. 134, 159 S.E. 444, 77 A.L.R. 923.

The principal is not ignored in the cases upon which the appellee herein especially relies since the circumstances under consideration convinced the court in each case that the criminal prosecution instituted by the agent had a direct relation with the preservation of the employer's property. See Jackson v. American Telephone & Telegraph Co., 139 N.C. 347, 51 S.E. 1015, 70 L.R.A. 738; Kelly v. Durham Traction Co., 132 N.C. 368, 43 S.E. 923; Id., 133 N.C. 418, 45 S.E. 826; Kelly v. Newark Shoe Stores Co., 190 N.C. 406, 130 S.E. 32; Long v. Eagle 5, 10, and 25¢ Store Co., 214 N.C. 146, 198 S.E. 573; Dickerson v. Atlantic Refining Co., 201 N.C. 90, 159 S.E. 446; Gillis v. Great Atlantic & Pac. Tea Co., 223 N.C. 470, 27 S.E.2d 283, 150 A.L.R. 1330.

The plaintiff contends that his case falls into the class of those last cited. He argues that the title to the property of the defendant was at stake in that the agent had issued a receipt for the blouse and it was an open question at the time of the arrest whether the plaintiff was guilty of theft and should be punished or was an innocent finder entitled to exchange the blouse upon surrender of the receipt. It seems to us that this position is completely untenable. The title to the blouse was never in doubt, according to the testimony of the plaintiff and his wife. They conceded that they had found it and declared that they wanted nothing to do with it when informed that it had apparently been stolen; and they were willing to accept the promise of the manager made voluntarily and without consideration to give them another garment. Even if it be supposed that the manager's promise were enforceable in law, it is too clear for argument that the recovery of stolen property, that had been in the undisputed possession of the store manager for nearly a month before the arrest, was not the purpose of the prosecution. The plaintiff's argument is really an attempt to bring about a modification or change in the law of North Carolina which refuses to clothe the manager of a business with implied authority to institute a criminal prosecution on his employer's behalf, not to protect the employer's property but merely to vindicate the law. The law of the state by which we are bound is too clearly established to justify such a decision.

The judgment of the District Court is reversed with directions to enter judgment for the defendant.

Reversed.